**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **Criminal No. 21-CR-254 (RCL)** |
| | : | |
| FRANK J. SCAVO, | : | |
| | : | |
| *Defendant.* | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Frank J. Scavo to 14 days of incarceration and $500 in restitution.

### I.     Introduction

Scavo participated in the January 6, 2021, attack on the United States Capitol – a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured over 100 law-enforcement officers, and resulted in over $1.4 million worth of property damage.

Scavo stands before this Court to be sentenced on a misdemeanor conviction, but his conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings.  But for his actions alongside so many others, the riot likely would have failed.

The government is requesting a 14-day term of incarceration based on an assessment of relevant sentencing factors.  Scavo unlawfully entered the Capitol at the Rotunda Doors, the site

of one of the most brutal breaches of the Capitol on January 6, 2021.  Multiple assaults on U.S. Capitol Police ("USCP") officers occurred there, some of which Scavo captured on his cellphone. Scavo entered within three minutes of the violent breach of the Rotunda Doors and those assaults. Once inside the Capitol, he recorded boastful statements on his cellphone about "storm[ing]" and "t[aking] . . . back" the Capitol.  In addition, following the events of January 6, Scavo made public statements, including a television interview, that either downplayed or made light of his conduct. At the same time, Scavo left the Capitol on his own volition about 10 minutes after he entered, submitted to two pre-arrest voluntary interviews with the Federal Bureau of Investigation ("FBI"), and voluntarily produced evidence to the FBI that captured his entry and conduct at the Capitol.

## II.   **Factual and Procedural Background**

*The January 6, 2021, Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the Capitol in ECF No. 33, at 1-3.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day.

*Scavo's Role in the January 6, 2021, Attack on the Capitol*

Scavo, a local political figure from Old Forge, Pennsylvania, traveled from Northeast Pennsylvania to attend the rally President Donald Trump planned to hold in Washington, D.C., on January 6, 2021.  Scavo helped charter buses to transport upwards of 200 local Trump supporters to the rally.

After arriving in Washington, Scavo posted a message to his Facebook page at approximately 1:26 p.m.: "V.P. PENCE FAILS AMERICA."  After hearing that Vice President Pence would not impede the certification of the Electoral College vote, Scavo made his way to the

Capitol. He also posted the following statements to Facebook (with the approximate times indicated):

- "Capitol steps stormed and" (2:00 p.m.)
- "The procession to the Capital" (2:00 p.m.)
- "On the move . . ." (2:01 p.m.)
- "It's going down . . ." (2:09 p.m.)
- "PENCE IS OUT OF CAPITOL . . ." (2:32 p.m.)

Scavo recorded a cellphone video of himself at the Rotunda Doors on the East Front of the Capitol, where hundreds of rioters gathered. Some of the rioters near Scavo screamed at, pushed, pulled, and otherwise assaulted police officers guarding the doors, eventually breaching that entryway. Scavo recorded some of this activity on his phone, including rioters wielding a riot shield they had wrested from the officers. Scavo also captured a partially obstructed view of a rioter grabbing the face shield of an officer, as depicted in the screenshots, below (circled in blue):



Scavo's video also reveals windowpanes on the doors were shattered.  Security alarms from inside the building can be heard in Scavo's recording, as well as people screaming at the officers and one person yelling, "Tear that door down!  Tear it the f*** down!"

An open-source video, available on YouTube, captures the breach of the Rotunda Doors at the time Scavo was there, but from a different angle than his cellphone's.[1]  From 00:38-01:47 in this video, rioters engage in a heaving maneuver designed to breach the doors while officers are cornered in the entranceway.  As they continue to be yelled at, shoved, sprayed with chemical irritants, and struck with flag poles and other objects, the distressed officers bend over and cover their faces to protect themselves.  Rioters steal a large riot shield from the officers.  These screenshots capture some of the conduct that occurred there, including assaults on the officers cornered in the doorway (circled in blue):



---

[1] This video is available at https://www.youtube.com/watch?app=desktop&v=MVullQb-Lec.







Shortly after recording some of the assaults on officers and before he entered the building, Scavo turned the phone's camera on himself and said, "Here we go," as depicted in the screenshot, below:



At approximately 2:40 p.m.— within three minutes of rioters breaching the Rotunda Doors—Capitol surveillance cameras showed Scavo crossing the Capitol's threshold.  As he entered the building, Scavo moved past at least two of the officers who had just been assaulted, held up his cellphone to record video, and walked up a stairwell at a normal pace and toward the Senate Wing of the Capitol.  His entry is depicted in the following sequential screenshots (Scavo circled in yellow, officers circled in blue):













At approximately 2:43 p.m., Scavo posted to Facebook, "No certification Today!!!"

Scavo continued recording video inside the building.  He captured himself joining chants of "Treason!" and "Defend the Constitution, defend your liberty!"  At one point, at the Capitol's East Senate Grand Staircase, he gave his phone to another individual to take his photo in front of a large painting depicting a scene from the War of 1812, as depicted, below:



Scavo also recorded video of himself saying, "This is top-secret s***.  We're in the Capitol.  Stormed the f***ing Capitol of the f***ing United States at 58 years old.  What the f*** is wrong with America?"  As he roamed the halls of the Capitol, Scavo also stated, "Your own personal tour of the freaking Capitol.  We f***ing took it back.  Took it back."   Capitol surveillance video shows Scavo was inside the building from approximately 2:40-2:50 p.m.

Scavo's participation in the breach of the Capitol drew attention from news media in his local community.  In an interview with a local news station, Scavo acknowledged that after hearing Vice President Pence would not certify the election in Trump's favor, he "hear[d] the first boom," and observed "people up along the railing" and "tear gas and another series of flashbangs."  The news station reported that Scavo told the station he was not in the building, and in segments of a video interview that the station published, he did not admit to entering the Capitol.[2]

After evidence surfaced that Scavo had unlawfully entered the Capitol, the FBI notified him he was under investigation.  Before his arrest, Scavo voluntarily submitted to two interviews with the FBI.

During the first FBI interview on January 15, 2021, Scavo admitted that after he learned Vice President Pence was not going to "contest" the election results, he heard a "loud bang from the front of" the Capitol.  He admitted that someone who traveled with him to Washington spoke with USCP officers and admonished others not to harass police officers.  Scavo proceeded to "the rear of the Capitol because it was less chaotic" and believed the crowds on the other side were "less radical."   When Scavo got to the "rear," or East Front, of the building, the crowds at the Capitol had grown larger, and he believed the Capitol was "under siege."  Scavo walked up the steps to the Rotunda Doors.  He saw a crowd began pushing towards the doors, and all the doors

---

[2] The news station's coverage of the interview is available at https://www.pahomepage.com/news/i-team-questions-arise-after-images-appear-to-show-local-activist-inside-u-s-capitol-during-unrest/.

opened outward.  He claimed he was then "pushed inside" the Capitol with the movement of the large crowd and was unable to resist getting pushed inward or he would have been "trampled."  He admitted taking photos and videos with his cellphone to "document" what was happening inside the building.  Scavo admitted he was inside the Capitol for approximately eight minutes.

During his second FBI interview on January 25, 2021, Scavo produced a thumb drive of video and photo evidence of his time at the Capitol.

On February 7, 2021, Scavo changed his profile picture on Facebook to a political cartoon that was published in a local Scranton newspaper.  The cartoon portrayed Scavo driving a bus named the "Sedition Express" to the Capitol on January 6:



Posting the cartoon as his profile picture spurred a flurry of comments to his page.  In response to one commenter asking, "That's not your driving?," Scavo replied, "tis me . . ur Capitol tour guide."  On March 25, 2021, Scavo posted a newspaper article reporting that Scavo expected to be federally charged for his participation in the Capitol riot, which Scavo characterized as the newspaper's

"persecution efforts of me."  Another commenter in that string of posts, which also contained the political cartoon, asked, "Frank is that you driving the bus?"  Scavo replied, "yep . . handsome."

In his statement to the Presentence Report ("PSR") writer, Scavo said that when he traveled to Washington to attend Trump's rally on January 6, 2021, "I did not know that some in the crowd were set on violent interference with the operations of government," but that "does not excuse my own actions."  He added, "About 2 minutes into my trespass into the Capitol, I realized this was wrong," and set out to find a way out of the building.  He acknowledged that "January 6, 2021, was a dark day in our country's history," said his participation was "wrong and it was a crime," and expressed "regret" for taking part.  He described community service he has undertaken since January 6, including picking up trash on a public road and volunteering at a soup kitchen, to "show that I am a humble person."  PSR at 8-9.

The FBI did not uncover evidence that Scavo engaged in violent or destructive conduct at the Capitol grounds or inside the building.  He has been cooperative with law enforcement since he surrendered to the FBI to be arrested in Scranton, Pennsylvania, on March 25, 2021.  From an early point in the prosecution, Scavo, through his attorney, has expressed a desire to plead guilty.

Scavo knew at the time he entered the Capitol that he did not have permission to enter the building and he paraded, demonstrated, or picketed inside the building.

*The Charges and Plea Agreement*

On March 23, 2021, Scavo was charged by complaint with violating 18 U.S.C. § 1752(a) and 40 U.S.C. § 5104(e)(2).  On March 25, 2021, he was arrested after he turned himself in to the FBI.  On March 26, 2021, Scavo was charged by an Information with four counts, violations of 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On September 8, 2021, he pleaded guilty to Count Four of the Information, which charged a violation of 40 U.S.C. §

5104(e)(2)(G).  In his plea agreement, Scavo agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Scavo now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000.  Scavo must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559(a)(7); U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).

#### A.  The Nature and Circumstances of the Offense

The attack on the Capitol on January 6, 2021, is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.  So too does the conviction this defendant now faces.  Picketing, demonstrating, or parading at the Capitol as part of the riot on January 6

was not like picketing at the Capitol some other day, without other or with relatively few rioters present.

All defendants should be sentenced based on their individual conduct.  But this Court should note that each individual person who entered the Capitol on January 6 did so under the most extreme of circumstances, and Scavo is no exception. As individuals entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement and smelled chemical irritants in the air.

Even before he made it to the Rotunda Doors and entered the building, Scavo knew a mob had descended on the Capitol.  He admitted to a news station that near the Capitol, he observed an initial "boom," "people up along the railing," and "tear gas and another series of flashbangs."  He also admitted to the FBI that before entering, he heard a "loud bang from the front of" the Capitol and that one of his associates admonished other rioters not to harass police officers.  He also admitted walking to the East Front because he believed the crowds there were "less radical."  He accurately recounted to the FBI that the Capitol was "under siege."

While looking at a defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with,

or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition.  While these factors are not exhaustive or dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

What makes Scavo's case especially noteworthy—and a major factor why the government believes that some incarceration is appropriate—is where he unlawfully entered the Capitol and what he observed there.

Scavo entered immediately following the breach of the Rotunda Doors on the Capitol's East Front, one of the most violent scenes from January 6.  The thin line of officers defending that entranceway was pushed, pulled, grabbed, yelled at, taunted, sprayed with chemical irritants, and struck with flag poles and other objects.  Scavo recorded some of this activity on his cellphone— including a partially obstructed view of one rioter grabbing an officer's face shield and rioters screaming at officers, including one man vulgarly yelling to tear the door down—severely undercutting his claim to the PSR writer that he "did not know that some in the crowd were set on violent interference with the operations of government."

The decent thing to do for anyone who observed this appalling attack would have been to realize it was horribly wrong and leave the area.  Yet Scavo did not turn away.  Astonishingly, he did not seem phased by the violence around him.  He turned his camera on himself, recorded himself exclaiming, "Here we go," and walked through the Rotunda Doors, past at least two officers who had just been assaulted.

Before and after he entered the Capitol, Scavo posted emphatic messages to his Facebook page suggesting he was disappointed that the Vice President failed to certify the Electoral College vote in Trump's favor and satisfied that rioters' actions had delayed the certification.  At approximately 1:26 p.m., he posted, "V.P. PENCE FAILS AMERICA."  At approximately 2:00

15

p.m., he noted, "Capitol steps stormed."   At approximately 2:09 p.m., he observed, "It's going down."   And at approximately 2:32 p.m., he reported, "PENCE IS OUT OF CAPITOL."   At approximately 2:43 p.m.–by which time he would have already entered the Capitol—Scavo bragged, "No certification Today!!!"

Scavo spent a relatively short time in the Capitol—about 10 minutes—before he left on his own volition.  But he engaged in significant disruptive conduct, even during that limited period.

As he crossed the threshold into the Capitol, he had his cellphone raised, and he admitted to the FBI he wanted to "document" what was happening.  Shortly after that, he climbed the nearby staircase and joined chants of "Treason!" and "Defend the Constitution, defend your Liberty!"

At one point, Scavo calmly stopped at the Capitol's East Senate Grand Staircase to have his picture taken in front of a large painting depicting a scene from the War of 1812.  Apparently, he did not appreciate the irony that he was participating in the first incursion into the Capitol by hostile combatants since that war over two centuries ago.

Scavo also boasted about the breach while still inside.  He recorded himself stating, "We're in the Capitol.  Stormed the f***ing Capitol of the f***ing United States at 58 years old.  What the f*** is wrong with America?"  On his way to find an exit out of the building, he narrated with satisfaction, "Your own personal tour of the freaking Capitol. We f***ing took it back.  Took it back."

The government has no evidence that Scavo engaged in any violence or destruction of property.  Nor did he conceal evidence from the FBI.  To the contrary, he voluntarily submitted to two pre-arrest interviews with and produced video and photo evidence from his cellphone on a thumb drive to the FBI.  He has been entirely cooperative since he self-surrendered to the FBI after the government charged him.  At an early point after he was charged, Scavo, through his attorney,

expressed a desire to plead guilty.  The government gives significant weight to his desire to resolve his case at an early stage.

Scavo has also expressed remorse for his conduct.  He acknowledged that his conduct on a "dark day in our country's history" was "wrong" and a "crime."  PSR at 9.

At the same time, before expressing remorse, Scavo minimized his participation in the riot by telling the FBI he was "pushed into" the Capitol and suggested he entered merely so he would not get "trampled."  The video evidence belies this assertion; Scavo did not look or sound distressed in any of that evidence.  Right before he entered the Capitol, he turned his cellphone camera on himself and enthusiastically stated, "Here we go," even as the Rotunda Doors had just been violently breached and officers assaulted right in front of him.  Once he crossed over the threshold, he calmly held up his phone to record what was happening around him.  He passed two officers who had just been attacked, walked up the stairs to the Senate Wing at a normal pace, and engaged in all the disruptive behavior described above in under 10 minutes.

Accordingly, the nature and circumstances of the offense—especially considering Scavo's entry despite observing the violent siege at the Rotunda Doors—establish the need for a sentence of incarceration here.

### B.  The History and Characteristics of the Defendant

As set forth in the PSR, Scavo does not have a prior criminal conviction.  PSR at 8.  He would likely have zero points if the Sentencing Guidelines did apply to his offense of conviction. USSG § 4A1.2(c)(2).  Accordingly, he would be in Criminal History Category I. USSG §§ 4A1.1, 5A.  In addition, he has represented that he has engaged in charitable service since pleading guilty. PSR at 9.  These factors would support a more lenient sentence.

On the other hand, the PSR also notes that Scavo has attained an associate's degree and leads a stable family and financial life.   PSR at 13-15.  With these advantages in his background, he knew better than to join a mob in breaching the Capitol.  Moreover, for approximately 13 years, Scavo has held and run for public office in his community; he has served on his local school board and ran for elective office in the state legislature in 2018 and 2019.  *Id.* at 13, 16.   While his public service and engagement in the political process are commendable, they make his participation in a riot that endangered public servants—including police officers, members of Congress, and Congressional staff and employees—and threatened the Nation's democratic electoral process all the more baffling and troubling.  Scavo is well aware of the importance of public service and the democratic institutions in which our public officials serve.  Likewise, he was in a unique position on January 6 to appreciate the grave danger the riot posed to our institutions.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the riot on January 6, 2021, including misdemeanor cases.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-00238 (TFH), Tr. 8/4/2021 at 3 (As Judge Hogan noted, "As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be

---

[3] FBI Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at:
 https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf.

expected.")  This factor also weighs in favor of incarceration for a defendant like Scavo, who witnessed the harrowing siege at the Rotunda Doors and boasted he had "stormed the . . . Capitol . . . at 58 years old" and "[t]ook it back" once he got inside.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing in *United States v. Paul Hodgkins*, 21-cr-00188 (RDM):

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. 7/19/2021 at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy.  It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this

court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See Hodgkins*, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

There is also a strong need for specific deterrence here. Scavo made provocative and boastful posts on Facebook before and after his breach of the Capitol. Further aggravating, even after he met with the FBI in January and knew he was under investigation and could face federal prosecution, he made jocular and provocative Facebook posts about his participation in the riot. On February 7, 2021, he adopted a political cartoon of himself driving the "Sedition Express" as his profile picture, and referred to himself as a "Capitol tour guide." In addition, on March 25, 2021, he described a newspaper's reporting that he could face federal prosecution as "persecution efforts" against him. This behavior shows he did not deem the consequences of his actions on January 6 to be that serious.

Both the need to deter generally and to deter Scavo specifically favor incarceration in this case.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law-enforcement officers, to conspiracy to corruptly interfere with Congress.[4] Each offender must be sentenced based on his or his individual circumstances, but with the backdrop of January 6 in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lesser end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes.   A probationary sentence should not necessarily become the default.[5]

Indeed, this Court has admonished that it did not "want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

---

[4] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[5] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL); *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165 (TSC).  The government is abiding by its prior agreement to recommend probation in these cases. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).  The government made no such agreement in this case.

Scavo has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating, and picketing in a Capitol building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9.  But the sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long the defendant remained inside, the nature of any statements the defendant made (on social media or otherwise), whether the defendant destroyed evidence of participation in the breach, *etc.*—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1364-65 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases

constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on codefendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of the legislative branch of the federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law-enforcement officials, and a large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol-breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increases and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police, prompt acceptance of responsibility, and expressions of genuine remorse.

Here, to avoid unwarranted sentencing disparities, the Court should also consider the sentence imposed in *United States v. Eric Torrens,* 2:21-cr-00204 (BAH).   While it is hard to find substantially comparable defendants in Capitol cases due to the limitless range of possible aggravating and mitigating facts in each case, there are some significant, though not perfect, similarities between Torrens and Scavo.

Like Scavo, Torrens observed assaults on law-enforcement officers before he entered the Capitol, though not as up-close as Scavo observed at the Rotunda Doors.  Also like Scavo, he spent approximately 10 minutes inside the Capitol before he left on his own volition, without law enforcement driving him out.  In addition, Torrens cooperated with the FBI's investigation and submitted to a voluntary interview after he was arrested.  Scavo's cooperation has been somewhat more extensive; before his arrest, he submitted to two interviews with the FBI and also produced cellphone evidence of his breach.  Both defendants have no criminal history, expressed remorse, and expressed an early desire to accept responsibility and plead guilty.

Scavo differs from Torrens in discussing—and minimizing—his conduct at the Capitol in a television news interview and in his social-media promotion of the events of January 6.  Where Torrens did not have such a media or online presence, Scavo posted multiple times on January 6 expressing dismay about his perception that Vice President Pence "FAILED AMERICA" and satisfaction that the riot had delayed the certification ("No certification Today!!!").  Scavo also made light of his participation after he met with the FBI by making the "Sedition Express" cartoon his Facebook profile picture and joking he was a "tour guide of the Capitol."

The government requested a two-week sentence of incarceration for Torrens, plus the payment of $500 of restitution.  Ultimately, Chief Judge Howell imposed a sentence of 36 months of probation, including 90 days of home detention and $500 restitution.

In addition, *United States v. Leonard Gruppo,* 1:21-cr-00391 (BAH), provides another helpful frame of reference.  Gruppo, a 28-year Army veteran, spent about six minutes inside the Capitol, a shorter time than Scavo, and did not boast about his unlawful conduct on social media, unlike Scavo.  But he engaged in some conduct that was more severe than Scavo's, such as scaling a short wall on his way inside the Capitol, disobeying the command of a law-enforcement officer to leave the building where he had entered, and destroying evidence from his cellphone after the riot.  The government requested a sentence of 30 days of incarceration for Gruppo, plus $500 restitution.  Chief Judge Howell imposed a sentence of 24 months of probation, including 90 days of home detention, plus a $3,000 fine in addition to the $500 restitution.

A third case for reference is *United States v. Boyd Camper,* 1:21-cr-00325 (CKK).  Like Scavo, Camper entered the Capitol despite seeing violence between rioters and officers, and made his 10-year-old son who had accompanied him stay back because he saw the danger.  Like Scavo, he discussed his conduct with the media, though Camper's statements were arguably more aggravating; while still near the Capitol on January 6, Camper told a CBS News reporter, "We're going to take this damn place.  If you haven't heard, it's called the insurrection act and we the people are ready."  In addition, Camper concealed video and audio evidence he had recorded from the FBI.  On November 12, 2021, the government requested, and the Court imposed, a sentence of 60 days of incarceration for Camper and $500 restitution.[6]

---

[6] In addition to *Camper,* the government is aware of at least five other Capitol-riot cases where sentences have been imposed on defendants who gave interviews to the media: *United States v. Sean Cordon,* 1:21-cr-00269 (TNM) (two months of probation and $2,000 fine); *United States v. Jack Griffith,* 1:21-cr-00204 (BAH) (36 months of probation, including 90 days of home detention, and $500 restitution); *United States v. Jenna Ryan,* 1:21-cr-00050 (CRC) (60 days of incarceration and $500 restitution); *United States v. Douglas Sweet,* 3:21-cr-00041 (CJN) (36 months of probation, including one month of home detention, $500 restitution, and 60 hours of community service); and *United States v. Lori Vinson,* 1:21-cr-00355 (RBW) (five years of probation, $5,000 fine, $500 restitution, and 120 hours of community service).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "'only one of several factors that must be weighted and balanced,'" and the degree of weight is "'firmly committed to the discretion of the sentencing judge.'" *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012) (quoting *United States v. Fernandez*, 443 F.3d 19, 32 (2d Cir. 2006)). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

After a review of the applicable § 3553(a) factors, the government, believes that a two-week term of incarceration and the agreed-upon $500 restitution is appropriate here.

## V.    <u>Conclusion</u>

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a).   As detailed above, the factors support a short sentence of incarceration. Balancing these factors, the government recommends that this Court sentence Scavo to 14 days of incarceration and $500 in restitution.   Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing a modest term of incarceration as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     */s/ Seth Adam Meinero*
SETH ADAM MEINERO
Trial Attorney (Detailee)
D.C. Bar No. 976587
United States Attorney's Office for the
 District of Columbia
202-252-5847
Seth.Meinero@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 15, 2021, I served a copy of the foregoing on all

parties to this matter as listed in the Court's Electronic Case Files system.

*/s/ Seth Adam Meinero*
SETH ADAM MEINERO
Trial Attorney (Detailee)